IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SERVISFIRST BANK,             )
                                     )
      Appellant,         )      NO. 3:19-cv-00432
                                     )      JUDGE RICHARDSON
v.                         )
                                   )      On appeal from the United States
CURAE HEALTH, INC., et al.,    )      Bankruptcy Court for the Middle
                                   )      District of Tennessee: Case No.
      Appellees.        )      18-05665

## MEMORANDUM OPINION

This matter is presently before the Court on the "Motion of Appellee to Dismiss Appeal as Equitably Moot" (Doc. No. 16, "Motion"), filed by Appellee Steven D Sass LLC, in its capacity as Liquidating Trustee and debtor representative ("Trustee"). Appellant, ServisFirst Bank ("ServisFirst"), has filed a brief in opposition to the Motion (Doc. No. 20, "Appellant's Response"), to which the Trustee has replied (Doc. No. 23). As part of a subsequently filed reply brief in support of its appeal, ServisFirst Bank included additional argument in opposition to the motion. (Doc. No. 24). As the Court believes the facts and law are adequately elucidated by the parties' filings, the Court will decide the Motion without a hearing.

## BACKGROUND

For the most part, the facts upon which the Motion turns—largely procedural facts—are not in doubt. Except as indicated otherwise, the following facts appear to be undisputed.

The Debtors[1] each filed a voluntary petition under Chapter 11 on August 24, 2018, in the United States Bankruptcy Court for the Middle District of Michigan (the "Bankruptcy Court"). All of these cases have been jointly administered under Bankruptcy Court Case No. 18-05665, as indicated in the case caption above, pursuant to order of the Bankruptcy Court issued five days later. Soon thereafter, pursuant to 11 U.S.C. § 1102, United States Trustee appointed an Official Committee of Unsecured Creditors ("Committee") for the Debtors.

Seeking liquidation rather than reorganization under Chapter 11, the Debtors (as debtors in possession) filed a plan of liquidation on January 22, 2019. Objections to the plan followed, and on March 4, 2019, the Debtors and the Committee filed a Joint Chapter 11 Plan of Liquidation ("Joint Plan") and a Disclosure Statement for Joint Chapter 11 Plan of Liquidation ("Joint Disclosure Statement"). In pertinent part, the Joint Plan creates a liquidating trust ("Liquidating Trust"), to be administered by the Trustee, to receive by transfer the Debtors' assets, pursue potential claims and causes of action of the Debtors, and to liquidate the Debtors' estates including by making distributions to Creditors in accordance with the terms of the Joint Plan. ServisFirst filed an objection to the Joint Plan, asserting that the Joint Plan was not feasible because the Debtors would not have enough unencumbered cash to pay the Debtors' administrative expense liabilities.

The confirmation hearing for the Joint Plan had been scheduled for May 9, 2019. On the eve of the hearing, a settlement was reached with respect to claims the Debtors' estate had against CHS/Community Health Systems, Inc. ("CHS"). Specifically, the Debtors, the Committee, and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Curae Health, Inc. (5638); Amory Regional Medical Center, Inc. (2640); Batesville Regional Medical Center, Inc. (7929); Clarksdale Regional Medical Center, Inc. (4755); Amory Regional Physicians, LLC (5044); Batesville Regional Physicians, LLC (4952); and Clarksdale Regional Physicians, LLC (5311).

CHS reached a settlement (the "CHS Settlement") providing, in pertinent part, for (i) a $3.5 million payment (the "CHS Settlement Funds") from CHS to the Liquidating Trust to be established under the Joint Plan; (ii) the release of debtor and estate claims against CHS; and (iii) the waiver of any distributions to CHS under the Joint Plan. The CHS Settlement was memorialized in a proposed order ("Proposed Order") filed that evening with the Bankruptcy Court. Counsel for ServisFirst was not involved in negotiating the CHS Settlement, and he was unaware of the Proposed Order until the next morning, *i.e.*, the day of the confirmation hearing. [2] (Doc. No. 16-2, Transcript of May 9, 2019 confirmation hearing ("Tr.") 40:24-41:6). [3]

If, as they claim,[4] the Debtors and the Committee believed that the CHS Settlement (and, to a lesser extent, certain other settlements reflected in the proposed order) resolved ServisFirst's Joint Plan feasibility objection, they were mistaken. The next day, at the confirmation hearing, the Debtors announced the CHS Settlement, stating that it would allow the Debtors to pay the administrative and priority claims asserted against the estates and fund the Liquidated Trust, thereby resolving ServisFirst's objection. (Tr. at 10:10-10:25; 20:22-21:20). Counsel for the Debtors then laid out his basis for asserting that the applicable confirmation requirements of section 1129(a) of the Bankruptcy Code had been satisfied such that the Joint Plan should be confirmed. (Tr. at 23:12-33:3). In the process, Debtors' counsel proffered the testimony of the Debtors' CEO at the time, Steve Clapp. Mr. Clapp then adopted under oath the proffered version

---

[2] As noted in a footnote below, however, Debtors' counsel disputes that ServisFirst did not know about the negotiations leading to the CHS Settlement.

[3] Citations to "Tr." are to the transcript page number, which happens to be one number lower than the page number for Doc. No. 16-2; the respective page numerations differ by one due to the inclusion of an exhibit caption page at the beginning of Doc. No. 16-2.

[4] The Court does not dispute that this was their belief, but it notes that the existence and sincerity of such belief is immaterial for present purposes.

of his testimony as his own testimony (Tr. 33:6-16), and no one accepted the invitation to cross-examine him (Tr. 34:2-3), including counsel for ServisFirst, who considered the possibility (Tr. 34:4-6), but ultimately did not do so.

Debtors' counsel expressed the viewpoint that the CHS Settlement resolved ServisFirst's objection to the Joint Plan because it provided the necessary cash to pay the Debtors' administrative and priority claims. (Tr. 20:10-21:9). Alas, ServisFirst did not see it that way; its counsel proceeded to make clear that the Proposed Order did not address all of ServisFirst's objections. (Tr. 34:13-14). He proceeded to explain that ServisFirst did not object to the CHS Settlement insofar as it called for the $3.5 million payment, but that ServisFirst asserted a lien on those funds and that he contemplated those funds going into "escrow," where the parties would "fight" or litigate over them. (Tr. 35:3-4; 13-25). ServisFirst's counsel further made clear that ServisFirst "does not consent to the use of any collateral in which it claims an interest to pay the administrative claims other than those set out in the budget . . . ." (Tr. 34:19-23). He concluded by noting that ServisFirst "contends that these proceeds are subject to the lien and can't be disbursed without its consent." (Tr. 36:5-6). The Bankruptcy Judge then seemed to confirm, or at least express an understanding, "that that money is going in escrow and the adversary [proceeding] will resolve that." (Tr. 36:8-9). To this, ServisFirst's counsel expressed his agreement with that understanding, his desire to prevail in the fight for those funds, and his understanding that the fight was for another day. (Tr. 36:10).[5]

---

[5] The parties disagree substantially over counsels' subjective understandings and agreements counsel conveyed through the particular words they used at the confirmation hearing—a significant issue on this Motion. To elucidate counsels' subjective views expressed at the hearing, the Court believes that they are best recounted herein in part by quoting particular words or phrases and in part by paraphrasing counsel's statements; when the Court does paraphrase, it does so carefully, with both an understanding of how important it is to paraphrase accurately and

In response to hearing this, counsel for the Committee expressed surprise, (Tr. at 36:22-23), then indicated that the subject(s) of the surprise was the fact that ServisFirst asserted a lien on the CHS Settlement Funds and maintained that they should go in escrow. (Tr. at 37:4-6, 14-16). He further asserted that the notion of placing the CHS Settlement Fund in escrow was a "non-starter," was entirely inconsistent with the CHS Settlement, and would prevent the resolution of ServisFirst's feasibility objection (because such resolution required funding the Liquidating Trust with CHS Settlement Funds unencumbered by any liens); he insisted that the validity of ServisFirst's lien would have to be resolved prior to confirmation of the Joint Plan because the Committee would not agree that the CHS Settlement was subject to, or that the Joint Plan could be confirmed subject to, ServisFirst's asserted lien. (Tr. 37:1-24). He suggested a recess, and one was taken. (Tr. 37:24-38:8). When court re-convened, Debtors' counsel firmly stated the same position Committee counsel had just expressed, and in fact suggested adding language to the confirmation order expressly clarifying that "ServisFirst has no lien, claim, or interest whatsoever in the $3.5 million received from CHS. (Tr. 38:12-39:8). For his part, Committee counsel chimed in that the confirmation order would provide that the CHS Settlement Funds "shall transfer to the liquidating trust, free and clear of any liens, claims, or encumbrances." (Tr. 39:14-17). He further stated:

> [T]o the extent Mr. Kelly comes in and says I want to reserve rights. There's no -- there are no rights to be reserved. Simply by operation of law, Your Honor, or by operation of the plan, by operation of the confirmation order, is the estate funds have to move to a liquidating trust free and clear of any such liens, claims, and encumbrances because what else is the liquidating -- the liquidating trust is in the business of distributing assets. And it's going to be distributing assets consistent with the terms of the plan. There's no asterisk, there's no well I want a mulligan on this issue. This -- it's very clear, Your Honor.

confidence that it has done so. Such paraphrasing fosters not only conciseness, but also the illumination of the parties as to how exactly the Court construes what was said.

(Tr. 39:18-40:3). In response, the Court indicated its understanding of counsel's point. (Tr. 40:5). Given the podium, counsel for ServisFirst then stated that ServisFirst did not intend to challenge the release given CHS, that the Proposed Order itself reserved all of the pre-petition liens, and that "to the extent that any of the $3.5 million is allocable to pre-petition claims of the debtors to which ServisFirst has a lien, that's the right that we're reserving to challenge the allocation." (Tr. 40:9-18). He continued:

> *I think that confirming the plan is fine.* The only issue is should some of these $3.5 million be allocated to the assets in which ServisFirst has a lien. . . . You just can't use the collateral in which ServisFirst has a lien to pay the admin expenses.
>
> And certainly, we'll -- we're happy to I guess have that resolved by Your Honor just like all the other issues we're going to have.

(Tr. 41:8-19) (emphasis added). In response, the Bankruptcy Judge offered counsel for ServisFirst an evidentiary hearing but, citing lack of advance notice (presumably of the CHS Settlement and Proposed Order),[6] he declined, then stated, consistent with the language highlighted above, "I think the solution is entering the confirmation order." (Tr. 41:23-42:9). Counsel for ServisFirst then denied that he was seeking a contingent confirmation order, explaining that he instead would have a right to appeal—which, the Bankruptcy Judge noted, he would have in any event if the Joint Plan was confirmed. (Tr. 42:10-13). Agreeing with the Court on that point, counsel for ServisFirst then injected the following caveat:

> I don't want to . . . waive that by agreeing to what they're saying. I've stated ServisFirst's position. Your Honor can enter whatever order Your Honor feels is appropriate given the proof that's been proffered and then you know, everybody has their respective rights.

---

[6] At the confirmation hearing, Debtors' counsel disputed that ServisFirst actually lacked such advanced notice. (Tr. 43:10-14). So did counsel for the Committee (46:13-47:2). However, the Court need not resolve this dispute in order to resolve the Motion.

(Tr. 42:18-23). He then expressed his understanding of the procedural posture in the event the Bankruptcy Court confirmed the Joint Plan: "If Your Honor decides you're going to rule against [ServisFirst on] this issue, that's going to be one of the things that in [sic] the order and the question then will be will the record support what's in the order." (Tr. 43:1-4). Evidently disinclined to pass up on opportunity to obtain the precise confirmation order he sought, Debtors' counsel then propose[d] that: "the Court treat what [counsel for ServisFirst] just said as an objection and that the Court overrule it"; "we submit the confirmation order with the words that I said earlier, [*i.e.,* that] ServisFirst has no interest in this $3.5 million; "we put that in the confirmation order and if they want to appeal, they appeal"; the Court make, and include in the confirmation order, a finding that ServisFirst has no lien whatsoever in [the CHS Settlement Funds]; and that the "confirmation order . . . says this money is clean [and that] ServisFirst has no interest in it." (Tr. 43:17:23; 44:3-6; 46:4-6). Debtors' counsel then stated his understanding of ServisFirst's position:

> I don't hear Mr. Kelly objecting to confirmation of the plan. What I hear him say is he reserves his right to appeal. And everybody has the right to appeal. And so, the debtors -- why don't we confirm the plan with that language. Mr. Kelly's appellate rights are preserved. That's how the debtors wish to proceed.

(Tr. 46:6-11). With further ado, the Bankruptcy Judge announced that he was prepared to confirm the Joint Plan "without any reservation, with the language that Mr. Gordon ha[d] proposed." (Tr. 47:11-13). He remarked, "[i]f there are appeals, let them come[.]" (Tr. 47:20). He concluded by stating:

> The Court is going to confirm this plan and find that it meets all the requirements under 1129. And I will expect a confirmation order that details everything we've discussed, everything you proffered, and the Court will sign that and get this case confirmed.

(Doc. No. 48:4-8). He subsequently did exactly that. And this appeal under 28 U.S.C. § 158(a)(1) followed.

<u>LEGAL STANDARD</u>

This Court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the Bankruptcy Court. 28 U.S.C. § 158(a)(1). Via the Motion, brought under Rule 8013(a)(1) of the Federal Rules of Bankruptcy Procedure,[7] the Trustee asks this Court to dismiss this appeal as equitably moot pursuant to Fed. R. Civ. P. 12(b)(1). *See Alexander v. Barnwell Cnty. Hosp.*, 498 B.R. 550, 557 (D.S.C. 2013) (finding that a motion to dismiss an appeal of an order confirming a bankruptcy plan as equitably or constitutionally moot is properly brought pursuant to Fed. R. Civ. P. 12(b)(1)).

The Court cannot hope to provide a better summary of the doctrine of equitable mootness than the one provided in *In re City of Detroit, Michigan*, 838 F.3d 792, 799 (6th Cir. 2016). There the Sixth Circuit set forth a succinct (not to say cursory) description of the nature of the doctrine and the requirements for its application in a particular case:

> Equitable mootness is not technically "mootness"—constitutional or otherwise—but is instead "a prudential doctrine that protects the need for finality in bankruptcy proceedings and allows third parties to rely on that finality" by "prevent[ing] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." *In re Ormet Corp.*, 355 B.R. 37, 40–41 (S.D. Ohio 2006) (relying on *In re Grimland, Inc.*, 243 F.3d 228, 231 (5th Cir. 2001), and *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000)). That is, unlike conventional mootness, equitable mootness is not concerned with the court's ability or inability to grant relief; it is concerned with protecting the good faith reliance interests created by implementation of the bankruptcy plan from being undone afterwards. *See In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ('equitable mootness').").

> More akin to waiver or forfeiture (or perhaps estoppel) than to conventional mootness, equitable mootness is "grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *See In*

---

[7] That rule provides: "A request for an order or other relief is made by filing a motion with the district or BAP clerk, with proof of service on the other parties to the appeal."

*re United Producers*, 526 F.3d [942,] [] 947 [(6th Cir. 2008)] (internal quotation marks omitted). Stated bluntly, equitable mootness negates appellate review of the confirmation order or the underlying plan, regardless of the problems therein or the merits of the appellant's challenge. *Cf. In re Made in Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005).

We analyze equitable mootness under a three-part test: (1) whether a stay has been obtained; (2) whether the plan has been "substantially consummated"; and (3) whether the relief requested would significantly and irrevocably disrupt the implementation of the plan or disproportionately harm the reliance interests of other parties not before the court. *See In re United Producers*, 526 F.3d at 947–48 (quotation marks and citations omitted). Whether a stay of implementation of the plan has been obtained is significant because:

> When an appellant does not obtain a stay of the implementation of a confirmation plan, the debtor will normally implement the plan and reliance interests will be created. Thus, the failure to obtain a stay will count against the appellant in determining whether an appeal should be denied on equitable mootness grounds. The failure to seek a stay ... is not necessarily fatal ... [but neither is merely seeking a stay sufficient in and of itself, as] a stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.

*Id.* at 948 (quotation marks, editorial marks, citations, and paragraph break omitted).

We measure "substantial consummation" by the Bankruptcy Code definition, which considers the extent of the debtor's transfer of property, assumption of responsibilities, and distribution of assets as prescribed by the plan. *See* 11 U.S.C. § 1101(2). "If a plan has been substantially consummated there is a greater likelihood that overturning the confirmation plan will have adverse effects on the success of the plan and on third parties." *In re United Producers*, 526 F.3d at 948. But even after substantial consummation, equitable mootness is not necessarily appropriate. *Id.* The most important factor is whether the relief requested would affect the rights of third parties or the overall success of the plan. *Id.* This requires a case-by-case assessment of the feasibility and effect of the relief requested, and determination of "whether it amounts to a piecemeal revision of the plan or a wholesale rewriting of it." *Id.*

*Id.* at 798-99.

In the Sixth Circuit, a district court's decision on the applicability of equitable mootness is reviewed *de novo*, and not for abuse of discretion.[8] *Id.* at 798 ("We review the district court's equitable mootness determination *de novo*." (citing *United Producers, Inc.*, 526 F.3d at 946).[9] This has ramifications not only for any potential appeal, but also for this Court. It means that unlike with many other the multi-factor tests it applies, in the Sixth Circuit a district court's decision as to the applicability of equitable mootness actually is not one within its sound discretion. The practical upshot of this reality for the undersigned is that he must think in terms of what is the singularly *right* outcome of the balancing of the applicable factors; he does not have luxury of reaching a decision because it is merely *colorable*. That is to say, it is not enough to choose one of the two options (*i.e.*, applying equitable mootness or not applying equitable mootness) on the grounds that such option is a justifiable even if arguably weaker option. The Court instead must endeavor to find the objectively stronger option by applying factors that, contradictorily, are inherently subjective (and arguably even ambiguous). The Court is aware of the difficulties of

---

[8] Not all circuits see it that way; for example, the Third Circuit applies an abuse-of-discretion standard. *United Producers, Inc.*, 526 F.3d at 946 (discussing and rejecting *In re Continental Airlines*, 91 F.3d 553, 560 (3d Cir. 1996)); s*ee also In re Paige*, 584 F.3d 1327, 1335 (10th Cir. 2009) (rejecting *United Producers, Inc.* and "adopt[ing] the abuse-of-discretion standard of review for determinations of equitable mootness in bankruptcy cases").

[9] The Sixth Circuit does so because "[s]uch a standard of review is consistent with this Court's plenary review of the decisions of a lower court exercising its appellate jurisdiction." *United Producers, Inc.,* 526 F.3d at 947. Such plenary view is appropriate, in the Sixth Circuit's view, because "'the court of appeals is 'in just as good a position to make this determination as was the district court.'" *Id.* at 946 (quoting *Continental Airlines,* 91 F.3d at 568 n. 4 (Alito, J., dissenting)).

pronouncing this kind of objective determination as the outcome of a subjective multi-factor test.[10] And yet this is exactly what the Court is called upon to do, and it will proceed accordingly.[11]

<u>ANALYSIS</u>

The Court addresses in turn each of the three factors comprising the mootness inquiry.

I.    <u>Failure to Obtain Stay Pending Appeal</u>

The first factor is, as noted above, described as "whether a stay has been obtained." But as noted below, one aspect of that issue—*i.e.*, whether the appellant even sought a stay—is especially relevant. Limiting its concession to the issue expressly raised by the first factor (which is not inappropriate), ServisFirst notes that it did not "obtain" a stay of the confirmation order. (Doc No. 20 at 2 n.1). However, there is more to the story: ServisFirst did not even seek a stay.

"Fed. R. Bankr. P. 8005 provides that a motion for a stay of a bankruptcy court order may be made to the district court pending an appeal of the order." *In re Metiom, Inc.*, 318 B.R. 263, 267 (S.D.N.Y. 2004). As Rule 8005 indicates, a motion for a stay is optional, and is not required to preserve the right to appeal. *Capital Factors, Inc. v. Kmart Corp.*, 291 B.R. 818, 823 (N.D. Ill.

---

[10] The undersigned has noted on multiple occasions that the outcomes of multi-factor tests (despite the advantages the undersigned perceives in them) tend to be unpredictable on the front end, given their subjectivity. Eli J. Richardson, <u>Eliminating the Limitations of Limitations Law</u>, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor"); Eli J. Richardson, <u>Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel</u>, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations.").

[11] In so doing, the Court is aware that some courts have allocated to the appellee the burden of showing the applicability of equitable mootness. *See, e.g., Paige*, 584 F.3d at 1336. The Court does not disagree and certainly does not allocate any burden to ServisFirst to avoid the application of equitable mootness. But the Court also believes that the issue of "burden" is something of a red herring here; the issue is not so much whether the Trustee has shown that equitable mootness should be applied; it is more whether, in the Court's view based on the record as a whole (including what the Trustee has or has not shown), the better result is to apply equitable mootness.

2003), *aff'd sub nom. In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) (noting that appellant was not required to seek a stay of the orders in order to preserve its appellate rights).

So one might think that by forgoing a motion to stay, an appellant does not imperil its right to appellate review in any way. Unfortunately for ServisFirst, that is not the law; by not moving for a stay, the appellant does indeed jeopardize its right to appellate review inasmuch as it is held against ServisFirst in the equitable mootness analysis.

As noted by one district court in this circuit:

> It is undisputed that [appellant] did not even initially appeal, let alone obtain (or even seek to obtain) a stay of, consummation of the asset sales and the [p]lans. It is an important policy of Bankruptcy law that court-approved reorganization plans be able to go forward unless a stay is obtained. *Bennett v. Veale,* 60 F.3d 828, 1995 WL 385147, p. 2 (6th Cir. 1995) (Unpublished Opinion). While the failure to seek a stay in itself is not determinative, it is highly relevant. *Id.* A party that elects not to pursue a stay bears the risk that a speedy implementation of a confirmation order will moot an appeal. *See Matter of Specialty Equipment Cos.,* 3 F.3d 1043, 1047 (7th Cir. 1993).

*In re HNRC Dissolution Co.*, No. 0:05-cv-79-HRW, 2006 WL 782837 (E.D. Ky. Mar. 28, 2006).[12]

As another district court in this circuit put it, "[t]hough failure to seek a stay 'is not necessarily

---

[12] Like many of the extant cases, *In re HNRC Dissolution Co.* involved a Chapter 11 reorganization, However, "the equitable mootness doctrine can apply in the context of a [Chapter 11] liquidation proceeding." *Parrett v. Nat'l Century Fin. Enterprises, Inc.*, No. 02-65235, 2005 WL 8162590, at *3 (S.D. Ohio Jan. 27, 2005) (collecting cases); *cf. City of Detroit*, 838 F.3d at 800 (noting that several courts have extended equitable mootness to liquidations under Chapter 7). In a case cited by ServisFirst, *Schroeder v. New Century TRS Holdings, Inc.*, 407 B.R. 576 (D. Del. 2009), the court implied that the equitable mootness doctrine applies in the liquidation context, with the caveat that in the litigation context, one relevant question (whether a successful appeal would unravel the plan) was a fact of "diminished significance." *Id.* at 588. The Court herein will bear in mind, in assessing the significance of this question, the particular (liquidating) context involved in the present case. *See In re BGI, Inc.*, No. 12 CIV. 7714 ALC, 2013 WL 10822966, at *10 (S.D.N.Y. May 22, 2013) ("Based on the foregoing, Appellants' contention that the doctrine of equitable mootness should not apply to these appeals because they involve a liquidation of assets is unpersuasive. Careful consideration of the facts bear on whether the appeals are moot, and liquidation, by itself, is not dispositive of the availability of equitable relief."), *aff'd,* 772 F.3d 102 (2d Cir. 2014).

fatal to the appellant's ability to proceed, *City of Covington [v. Covington Landing Ltd. Partnership,* 71 F.3d [1221,] 1225–26 [6th Cir. 1995], parties with objections should act early and quickly, moving for stays where necessary to protect the status quo." *Ormet Corp.,* 355 B.R. at 41 (internal quotation marks omitted) (citing *In re Arbors of Houston Assoc. Ltd. Partnership,* No. 97–2099, 1999 WL 17649, at *2 (6th Cir. Jan. 4, 1999)).

In short, policy considerations favoring the prompt consummation of plans (of liquidation as well as reorganization) run headlong into policy (and fairness) considerations generally supporting a party's right to appeal. Where an appellant does not even seek a stay of a confirmation order, it undermines its (presumed) position that the policy in favor of its right to appeal prevails over the countervailing policy favoring consummation of bankruptcy plans.[13] The net effect is that what is ostensibly an optional stratagem—seeking a stay pending appeal—is *not* optional for an appellant seeking to maximize its chances of avoiding dismissal of the appeal on grounds of equitable mootness. Just or unjust, this was the legal context in which ServisFirst was operating and for which its decision-making needed to account. That is what happened here; by failing to move for a stay, ServisFirst hurt (though did not completely destroy) its position that its appeal should proceed in the face of the Trustee's assertion of equitable mootness.

Thus, it counts against ServisFirst that it failed to obtain a stay, and indeed did not even

---

[13] This is not the only context in which the cherished American prerogative to appeal a final order runs headlong into, and may give way to, a countervailing policy consideration. Another example is presented in cases brought under the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*, implementing the 1980 Hague Convention on Civil Aspects of International Child Abduction; in such cases, a stay of a district court order to promptly return the affected child(ren) to the country where they previously resided is not the norm even though a stay would be necessary to enable the appellant-parent to complete an appeal. *Chafin v. Chafin*, 568 U.S. 165, 179 (2013) ("If losing parents were effectively guaranteed a stay, it seems likely that more would appeal, a scenario that would undermine the goal of prompt return and the best interests of children who should in fact be returned.")

attempt to obtain a stay. As to exactly how much it counts, the case law is unclear, other than to suggest (as discussed above) that it is significant, and even "highly relevant," but not as important as the third factor. The weight to be given this failure surely depends on the particular facts involved here, especially the discussion at the May 9, 2020 confirmation hearing, which the Court set out in detail above for just this reason. The relevant inquiry, the Court believes, is what those facts suggest about just how imprudent it was for ServisFirst not to seek a stay of the confirmation order.

In the Court's view, the discussion at the hearing suggests several things that cut against ServisFirst, making its forgoing of a motion to stay especially imprudent: (1) it was made abundantly clear that the Trustee and the Committee intended to move forward to consummate the Joint Plan despite ServisFirst purporting to have an appealable issue; (2) relatedly, the Debtors and the Committee intended to completely ignore any notion that the CHS Settlement Funds needed to be left untouched or preserved to any extent (in "escrow" or otherwise) pending any appeal; (3) ServisFirst consented to the entry of the proposed confirmation order, albeit with numerous and vociferous protestations that it was preserving its right to appeal; (4) ServisFirst declined an express opportunity for an evidentiary hearing on its objection to confirmation of the Joint Plan; and (5) ServisFirst knew that the substantive decision on any appeal would be made based solely on the existing record (devoid of any elucidation such an evidentiary hearing may have provided). Collectively, these factors indicate that ServisFirst well understood that, absent a stay, the confirmed plan would be going forward despite the pendency of any appeal, and that ServisFirst itself *had a role, and arguably even signaled acquiescence, in that by consenting to the entry of the confirmation order*. Under the circumstances, it was imprudent for ServisFirst not to move to stay the confirmation order pending appeal—especially if it wanted to correct any misimpression

that it acquiesced in the consummation of the Joint Plan prior to the resolution of any appeal of the confirmation order.

In ServisFirst's favor, by contrast, is the fact that its counsel stated, and Debtors' counsel and Committee's counsel understood, quite clearly that it intended to appeal. This fact provides some support to ServisFirst, but not nearly as much support on the equitable-mootness issue as on, for example, the separate issue of whether ServisFirst waived its right to appeal.[14] But as the above-referenced discussion makes plain, it is one thing to appeal, and it is another to stay a confirmation order pending an appeal. ServisFirst indicated an intention to do the former, but not the latter— either at the confirmation hearing or at any time thereafter. Thus, ServisFirst's clear expression of an intent to appeal did not somehow cure (or prevent) the problem the doctrine of equitable mootness is intended to cure: preventing innocent third parties from being burned by their good faith reliance on the implementation of the bankruptcy plan that was allowed to proceed but then may have to be undone in the event of a successful appeal.

In summary, especially given the specific and unique facts of this case, it is highly relevant, though not dispositive, that ServisFirst did not obtain or even seek a stay of the confirmation order. The significance of this is reflected in the following passage from *In re Hamady Brothers Food Markets*, 110 B.R. 815 (E.D. Mich. 1990), cited (albeit without a complete case citation) by the Trustee:

> An important factor to consider is the appellant's failure to obtain a stay. While failure to procure a stay is not *per se* dispositive that an appeal is moot, courts have held that where a party seriously seeks an outright reversal of a bankruptcy court's order of confirmation, that party should not sit idly by while allowing intervening events to extinguish old rights and create new ones. Cases have held that an appeal may be dismissed as moot where an appellant neglects diligently to

---

[14] As ServisFirst's briefing suggests, these are separate (if somewhat overlapping) issues. (Doc No. 24 at 4). The Court does not reach the latter issue, *i.e.*, whether ServisFirst waived its right to appeal.

pursue available remedies such as a stay, or where an appellant, through 'procedural ineptitude,' pursues legally ineffective courses of action, which result in a comprehensive change of circumstances of the parties involved in the case.

In this case, it is a mystery why [appellant] agreed to enter the Consent Order abandoning the stay, if [appellant] did indeed seriously seek an outright reversal of the Order of Confirmation. As [appellant] points out, the Consent Order did not waive, but instead expressly preserved, [appellant's] right to pursue the appeal. Nevertheless, while the Consent Order ostensibly preserved [appellant's] appeal, it simultaneously allowed to go forward substantial action in confirmation of the plan, and insulated much of that action from the effects of the outcome of [appellant's] appeal. Thus, if [appellant] is to be held to the consequences of its action in entering into the Consent Order, [appellant] may in fact have waived the appeal that it meant expressly to preserve.

110 B.R. at 817-18 (internal citations omitted). *Hamady Bros.,* is on point, and its principles are applicable here, though notably the issue technically is not exactly "waiver" of the appeal, but rather equitable mootness. The application of equitable mootness here is supported by the first factor.[15]

## II.   Substantial Consummation of the Joint Plan

"We measure "substantial consummation" by the Bankruptcy Code definition[.]" *City of Detroit*, 838 F.3d at 799. Under that definition, "substantial consummation" means:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). The Court finds that this definition has been satisfied. First, all or

---

[15] This is true even though *Hamady Bros.* involved an express abandonment of the right to seek a stay, rather than the mere forgoing of a right to seek a stay as occurred in the present case. The Court also notes that it does not accuse ServisFirst of "procedural ineptitude," but rather merely notes the nature and consequences of its not taking the procedural step of moving for a stay.

substantially all of the property proposed to be transferred under the Joint Plan has been transferred. As the Trustee explains it, "On the Effective Date, title to all assets of the Debtors' bankruptcy estates (other than D&O Claims and Tort Claims) automatically passed to the Trust, and the CHS Settlement Funds . . . were transferred to the Trust. The Trust also received additional funds, all but $2,069,826.10 of which . . . are subject to a lien asserted by ServisFirst [but challenged by the Trustee]." (Doc No. 16 at 15-16). These factual assertions are support by the declaration of the Trustee. (Doc. No. 17-3 at 4-5). ServisFirst challenges neither these facts nor the conclusion that they indicate satisfaction of the first element of the definition.

The Trustee also asserts that "[t]he second element of substantial consummation has been satisfied because the Trustee has assumed management of all the property dealt with by the Plan" by, among other things, seven steps he specifically outlines. (Doc. No. 16 at 16). ServisFirst challenges neither these facts nor the conclusion that they indicate satisfaction of the second element of the definition.

ServisFirst instead challenges the existence of the last element of the definition of "substantial consummation," *i.e.*, commencement of distributions. It argues that ServisFirst contends that the "commencement of distributions" within the meaning of section 1101(2)(C) has not occurred, because it means distributions to "creditors" as defined under section 101(10), which does not include estate professionals or post-petition administrative claimants (who, ServisFirst asserts, are effectively the only recipients of distributions to date). But as the noted by the Trustee, the cases upon which ServisFirst relies here "concern transfers of property under the plan for the purposes of section 1101(2)(A), not distributions for the purposes of section 1101(2)(C), and they

do not cite or make any connection to section 101(10)." (Doc. No. 23 at 6).[16] As for cases that do

address Section 1101(2)(C), the Trustee cites two that "have relied upon the distribution of funds

to professionals and post-petition administrative creditors in determining that distributions under

a plan have commenced for the purposes of section 1101(2)(C)." (Doc. No. 23 at 6). Each such

case is unreported and from outside the Sixth Circuit. Moreover, in one of the cases, the court

relied additionally upon "a round of distributions to allowed claims by unsecured creditors." *In re*

*BGI*, 2013 WL 10822966, at *6. And in the other, the bankruptcy court had approved the fee

applications of professionals participating in the bankruptcy, but it is unclear whether the approved

payments had already been made or even commenced. *See In re President Casinos, Inc.*, No. 4:08-

cv-1976 CDP, 2010 WL 582794, at *6 (E.D. Mo. Feb. 16, 2010), *aff'd*, 409 F. App'x 31 (8th Cir.

2010)

Thus, the Trustee's showing of legal authority here was hardly overwhelming. But it tends

to support the Trustee's position. So does another (admittedly out-of-circuit) case, *In re Fansal*

*Shoe Corp.*, 119 B.R. 28 (Bankr. S.D.N.Y. 1990). There the trustee had fully paid the class of

priority administrative claims as well as the priority tax claimants. Even though it appears that no

other distributions had been made, the court found that the debtor had commenced distributions

within the meaning of Section 1101(2)(C). *Id.* at 29, 31.

The Court is satisfied that the Trustee has shown the requisite "commencement of

distributions" within the meaning of Section 1101(2)(C). Thus, with the final element of the

---

[16] The Trustee also claims that (at least as of September 5, 2019) distributions have been made not just to estate professionals or post-petition administrative claimants, but also to one or more pre-petition claimants. (Doc. No. 24 at 6). But he does not support this assertion with a citation to the record. For its part, ServisFirst refers to distributions made to a single pre-effective date administrative expense claimant. In any event, the Court does not rely on this particular claim of the Trustee.

statutory definition satisfied, the Trustee has shown that "substantial consummation" has occurred.

Arguing otherwise, ServisFirst invokes *Schroeder v. New Century TRS Holdings, Inc.*, 407 B.R. 576 (D. Del. 2009). But this case is simply inapplicable because it used a materially different measurement of substantial consummation that the one used by the Sixth Circuit—the bankruptcy code definition alone. Specifically, *New Century TRS Holdings, Inc.* was based on Third Circuit law, whereby the district court "first looks to whether the bankruptcy code's definition of "substantial consummation" has been satisfied." *Id.* at 588. "If this definition has been satisfied, the court may then look to whether a successful appeal would unravel the plan." *Id.* This is simply not the case in the Sixth Circuit, where concerns about the unraveling of the plan are addressed in connection with the third factor exclusively. What's worse for ServisFirst, in *New Century TRS Holdings, Inc.*, which ServisFirst portrays as factually similar to the present case, the court found that the plan *had* been substantially consummated: "In this case, the bankruptcy code's definition of substantial consummation has been satisfied: debtors' assets have been transferred to the liquidating trust for disposition and distributions have commenced." *Id.* at 588-89.[17] Still worse, ServisFirst very regrettably told this Court point blank (and with a pinpoint cite) that "*New Century TRS Holdings* held that the plan was not substantially consummated." (Doc. No. 20 at 7). ServisFirst's reliance on *New Century TRS Holdings* has backfired on it.[16]

---

[17] The court in *New Century TRS Holdings* went on to say that despite substantial consummation of the plan, this (second) factor ultimately did not weigh in favor of finding equitable mootness, because, when it addressed the second step of this factor, it found that reversing the plan would result in "great difficulty or inequity." *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 589 (D. Del. 2009). But this does not help ServisFirst on the second factor, because (as noted above), it involved a step, and circumstances, not recognized by the Sixth Circuit as part of this factor. And it certainly does not cure ServisFirst's misrepresentation that the court in *New Century TRS Holdings* "held that the plan was not substantially consummated." (Doc. No. 20 at 7).

III. <u>Whether the relief requested would significantly and irrevocably disrupt the implementation of the Joint Plan or disproportionately harm the reliance interests of other parties not before the Court.</u>

Asserting that the final factor likewise supports application of equitable mootness, the Trustee argues that the relief requested would both (i) irrevocably disrupt the implementation of the plan, and (ii) disproportionately harm the reliance interests of other parties not before the Court. If the Trustee is correct on either point, then this factor—the most significant one—weights in the Trustee's favor.

Arguing the first point, the Trustee refers to the Bankruptcy Court's unchallenged feasibility determinations under sections 1129(a)(9) and (11) of the Bankruptcy Code.

"Feasibility is a mandatory requirement for confirmation." *In re Made in Detroit, Inc.*, 299 B.R. 170, 175 (Bankr. E.D. Mich. 2003), *aff'd*, 414 F.3d 576 (6th Cir. 2005). The plan does not need to guarantee success, but it must present reasonable assurance of success. *Id.* at 176. To be confirmed, a plan must be "doable." *Id.* Although neither paragraph mentions the word "feasible" (or possible, or reasonably likely, etc.), paragraphs (a)(9) and (a)(11) are the provisions that embody the so-called "feasibility" requirements for confirmation of a Chapter 11 plan. *See id.* at 181 (denying confirmation of debtor's Chapter 11 plan "because the Court holds that the [d]ebtor's [p]lan is not feasible under 11 U.S.C. § 1129(a)(11) and 11 U.S.C. § 1129(a)(9)").

The Trustee argues that "without the use of the full $3.5 million in Settlement Funds to pay administrative and priority claims against the Debtors and fund the Plan, the Plan would not have been feasible and the Court could not have confirmed the Plan consistent with section 1129 of the Bankruptcy Code." (Doc. No. 23 at 9). In so doing, the Trustee points to his Declaration, (Doc. No. 17-3), which includes raw facts about the funding of, and authorized disbursements from, the Liquidating Trust made pursuant to the Joint Plan. The Court agrees. The record shows a feasibility determination, and thus confirmation of the Joint Plan, was entirely dependent upon the CHS

Settlement Fund being available to pay administrative and priority claims and fund the Joint Plan to pay creditors (and not just professional fees), unencumbered by ServisFirst's purported lien. If the CHS Settlement Fund had been subject to a lien in favor of ServisFirst, the Joint Plan would have had no chance to succeed and thus no chance to properly be confirmed in the first place. And if ServisFirst were to prevail on this appeal, such that the confirmation order in its current version were reversed, and ServisFirst's lien on the CHS Settlement Funds were deemed valid, on remand the (altered) Joint Plan would stand no chance of confirmation.

Seeking to sidestep this obvious conclusion, ServisFirst characterizes its appeal as "simply seek[ing] to overturn a single provision of the confirmation order that provides, with no evidentiary support, that none of the $3.5 million CHS Settlement Payment is subject to ServisFirst Liens." (Doc. No. 20 at 8). But its portrayal of the applicable provision as erroneous (because lacking in evidentiary support) is beside the point; equitable mootness is applied (or not applied, as the case may be) irrespective of whether the appealed bankruptcy court decision was erroneous. *City of Detroit*, 838 F.3d at 798 ("[E]quitable mootness negates appellate review of the confirmation order or the underlying plan, regardless of the problems therein or the merits of the appellant's challenge.").

ServisFirst next asserts:

> Granting relief to ServisFirst does not require that the plan be unwound or that the confirmation process begin anew. It simply requires that this matter be remanded to the bankruptcy court for a hearing on the extent to which the CHS Settlement Payment (which is not the plan's sole funding source) represents the proceeds of ServisFirst's collateral and thus is payable to ServisFirst, and not other creditors or professionals.

(Doc. No. 20 at 8).

"What's the harm from a mere remand and a hearing?" ServisFirst seems to be asking. This rhetorical question misses the mark. When, as here, equitable mootness is raised in response to an

appellant seeking to reverse a substantially consummated plan, the Court's proper focus is not upon the effect of ServisFirst *seeking* reversal (merely a remand and a hearing, in ServisFirst's telling). Instead, the proper focus is the effect of the *reversal being sought. See In re Eagle Picher Indus. Inc*., No. 96-4309, 97-4260, 1998 WL 939869, at *5 (Dec. 21, 1998) ("To the extent that [d]ebtors seek to reverse the substantially consummated [p]lan, we find that reversal is not possible or desirable."). Put somewhat differently, ServisFirst mischaracterizes the "relief" it seeks. It is not a remand *and a hearing before the bankruptcy court on whether* the CHS Settlement Funds are subject to a lien in favor of ServisFirst; it is, instead, the district judge's *outright reversal* by of the confirmation order, *with a ruling that* ServisFirst's lien on the CHS Settlement Fund henceforth be recognized.

This is made plain not only by its Notice of Appeal (Doc. No. 1 at 1), but also by its waiver of an evidentiary hearing in advance of the entry of the confirmation order. ServisFirst takes pains to claim that it did not waive its right to appeal and that it preserved its right to the evidentiary hearing. The first claim is correct, as it preserved its right to appeal (albeit one that, as in every case, was subject to the application of equitable mootness). But the second one is not. ServisFirst expressly waived the opportunity for an evidentiary hearing prior to the entry of the confirmation order, and it must live with this choice despite its (unsupported) claim (Doc. No. 20 at 16) that the offer was made only "tongue-in-cheek" by the bankruptcy judge. Like any appellant, ServisFirst obviously sought to prevail on its appeal, *i.e.*, to obtain a reversal of the confirmation order, and to obtain it from the district judge based on the record as it then existed, rather than from the bankruptcy judge based upon a record expanded pursuant to a remand from the district judge:

> If Your Honor decides you're going to rule against this issue, that's going to be one of the things that in the order and the question then will be will the record support what's in the order.

(Tr. at 43:1-4).

Relatedly, ServisFirst claims that it is not seeking to overturn the entire confirmation order, but rather only the single provision that deems the CHS Settlement Fund not subject to ServisFirst's asserted lien. ServisFirst thus implies that the relief it seeks can coexist with the confirmed Joint Plan. But it fails to explain how, since the Joint Plan is entirely premised upon the CHS Settlement Fund going to parties other than ServisFirst. Having devoted its focus to insisting that it did not seek reversal of the confirmation order. Still less does it explain how the Joint Plan could possibly survive a ruling that CHS's Settlement Fund is subject to a lien of ServisFirst. Without question, the Joint Plan could not be confirmed because, as noted above, it would not satisfy the "feasibility" requirement. In short, ServisFirst's requested relief on appeal would unravel the entire Plan.

It follows that ServisFirst's requested relief also would harm the reliance interests of other parties not before the Court. It may be, as ServisFirst argues (Doc. No. 20 at 9), that those professionals who have been paid (for services provided to the debtor or the Committee) pursuant to the Plan thus far do not qualify as "parties not before the court" for purposes of this third factor. But that does not mean that others that do so qualify would not suffer harm to their legitimate reliance interests. The Trustee identifies numerous such parties (Doc. No. 22-23), and the Court concurs that they qualify. Most of these parties are ones whose negotiations and settlements with the Trustee and others would have to be re-created were ServisFirst to obtain the relief it seeks. This counsels in favor of applying equitable mootness. *See City of Detroit*, 838 F.3d at 799. (applying equitable mootness in part because unraveling the confirmation order being appeal would "require a wholesale recreation of the vast and complex web of negotiated settlements and agreements[]").

In *Eagle Picher Indus. Inc.*, the Court noted, "To the extent that [d]ebtors seek to reverse the substantially consummated [p]lan, we find that reversal is not possible or desirable. The [p]lan represents the culmination of seven years of litigation and negotiations among the various constituencies in [d]ebtors' Chapter 11 cases." 1998 WL 939869, at *5. This case had not been pending for seven years prior to the confirmation of the Joint Plan, but it does involve a good deal of litigation and negotiation among the various constituencies, and the Court cannot see where reversal is practicable or desirable, especially absent a request to stay from ServisFirst.

<u>CONCLUSION</u>

This case has much in common with *City of Detroit*, which the Sixth Circuit summarized as follows:

> In this case, all three factors favor the application of equitable mootness: the appellants did not obtain a stay; the [p]lan has been substantially consummated, inasmuch as numerous significant—even colossal—actions have been undertaken or completed, many irreversible; and the requested relief of omitting the bargained-for (and by majority vote agreed-upon) pension reduction would necessarily rescind [an agreement wherein the debtor municipality obtained funding from outside sources to pay certain of its pension obligations while settling those obligations at less than their full amount].

838 F.3d at 799. True, the actions thus far undertaken, and the imperiled settlement agreement, in this case are not nearly as significant in *City of Detroit*. But this case, with its absence of a request to stay from the appellee, and the imperilment of a complex settlement agreement of its own (the CHS Settlement), is similar. Thus, although not quite the antithesis of a "close call" that *City of Detroit* was, *id.*, the call is this case is clear: equitable mootness applies to extinguish ServisFirst's appeal.

As noted above, the Court's unusual task here is to determine, based on a subjective multi-factor test, the objectively better answer to the question of whether equitable mootness applies in this case. The Court concludes that that the answer is yes, inasmuch as in the Court's view each of

the three factors point in favor of the doctrine's application. Accordingly, the Motion (Doc. No. 16) will **GRANTED**, and ServisFirst's appeal will be dismissed as moot.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE